IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



PETER WEISMAN,

    Plaintiff,

v.

DANIELLE GARDNER,

    Defendant.

VERIFIED COMPLAINT

Civil Action No.

06 CV 6012

    Plaintiff Peter Weisman, by his attorneys, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., for his Complaint against Defendant Danielle Gardner, alleges as follows:

## INTRODUCTION

    1.     This action is for breach of contract, breach of fiduciary duty and declaratory judgment and seeks a preliminary injunction, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, in aid of arbitration, which arbitration is currently pending before the American Arbitration Association. Specifically, defendant has taken unilateral steps, including purporting to fire a key employee of the company, that are deleterious to the company and thus injure plaintiff's interests and those of the company's other investors. Those actions violate the Operating Agreement that governs the entity for which the parties are co-Managers because the Operating Agreement requires any such action to be taken only after a unanimous vote of the Managers - - something defendant has failed to obtain. By this action, plaintiff seeks to maintain the status quo ante and to prevent defendant, until the completion of the arbitration, from continuing to interfere with and irreparably harm the company's business operations and plaintiff's interests in them.

## PARTIES

2.  Plaintiff Peter Weisman ("Mr. Weisman" or "Plaintiff") is an individual who resides in Spartanburg, South Carolina. Mr. Weisman is a co-Manager of P&J Realty Management, LLC ("P&J"), a New York limited liability company.

3.  Upon information and belief, Defendant Danielle Gardner ("Danielle") is an individual who resides at 220 West 15th Street, New York, NY 10011. Danielle is the other co-Manager of P&J. She succeeded to that position as a result of Danielle's father, Mr. Joseph H. Gardner ("Joe"), who was the co-Manager with Mr. Weisman and with whom Mr. Weisman had been a business partner for approximately 38 years, passing away and pursuant to the terms of Joe's last Will and Testament.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are residents of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

5.  Venue in this District is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS

### The P&J Operating Agreement, its Salient Terms and P&J's Operations

6.  Mr. Weisman started a real estate investment firm in 1968. Joe, who was a partner in an accounting firm at the time, invested with him in a building that they converted into rental apartments. A short time thereafter, P&J was formed.

7.  P&J is a management company whose purpose, as stated in the Operating Agreement of P&J Realty Management, LLC, dated December 2, 1999 (the "Agreement"), is as

follows:

> ... to renovate, construct, improve, rent, manage, deal with, sell, convert to other forms of ownership, invest in or dispose of real property, and to engage in all other matters evident or related to the business of investment in real property, and to engage in all other matters evident or related to the business of investment in real property, directly or through partnerships, other limited liability companies, or corporations.

8. According to the Agreement, P&J's business and affairs are to be managed by two Managers -- initially Joe and Mr. Weisman. Importantly, pursuant to paragraph 5(b) of the Agreement, "[a]ll decisions of the Managers shall be <u>unanimous</u>, although following a decision by the Managers, any one Manager can effectuate such decision (by signing of documents, etc.)."

9. Also, paragraph 5(g) of the Agreement expressly states a mechanism for appointing a successor Manager upon the death of one of the Managers. After Joe's death, Danielle, who had never substantively participated in the business, was designated to act as his successor Manager.

10. Section 14 of the Agreement contains a broad arbitration provision that requires all disputes "arising under, out of, in connection with, or in relation to" the Agreement to be arbitrated before the American Arbitration Association.

11. Over the course of their 38 years as business partners, until Joe's death, Mr. Weisman and Joe together built a successful real estate business, amassing a highly profitable portfolio of real estate properties located throughout New York City. Each piece of property is owned by a separate limited partnership or limited liability company and each is governed by its own agreement. P&J manages each of those properties and its realty portfolio consists of properties worth more than $225 million.

12. In 1997, Mr. Weisman moved to South Carolina but remained and still remains an

3

active Manager of P&J, directly involved in the day-to-day management of our properties. Also, because he had designed and effectively built most of the buildings in P&J's portfolio, he was able to troubleshoot from his Spartansburg offices the buildings' mechanical problems that would arise from time to time as well as establishing a program of preventive maintenance. Moreover, as mandated, Joe and Mr. Weisman agreed, unanimously, on each decision made at P&J.

13.     On March 1, 2006, Joe died. Shortly after Joe's death, Danielle, who previously had no involvement in any aspect of our real estate business, became a co-Manager with Mr. Weisman. However, but for attending an infrequent meeting, she spent little time, if ever, in the office during business hours. Then, beginning in or about mid-June 2006, for reasons still unknown to Mr. Weisman and unstated by Danielle, Danielle deliberately started interfering in P&J's business wrongfully, to the detriment of Plaintiff, P&J, all of the properties P&J manages and the investors who have invested in those properties.

**Danielle's Wrongful Interference In P&J's Business**

14.     As stated above, P&J effectively functions as a management company for the myriad of other partnerships and entities jointly owned by Joe, Mr. Weisman and the investors in the limited partnerships and limited liability companies. P&J currently has five employees, plus Mr. Weisman.

15.     On or about December 1, 2004, Joe and Mr. Weisman, as Managers of P&J, hired Mr. Christian Desvallees to work as P&J's CFO. He started in early May 2005. Over time, Mr. Desvallees' job description expanded to include: managing, streaming and optimizing the day-to-day operations of P&J, including overseeing collections of rental income, creating systematic quarterly commercial and retail rent-roll reports for the general partners, analyzing residential

markets in the New York area, noting that our current rents were 40% below the market and increasing rents for renewals and new leases, drafting lease abstracts, and working with residential and retail commercial real estate brokers and outside managers; managing the financial condition of P&J, including managing its cash flow and improving the cash management of various properties, reviewing invoices of vendors and insurance carriers, creating income statements for each of the properties, analyzing renovation costs, working with real estate tax consultants to appeal and reduce tax assessments on properties, and negotiating with utilities to reduce energy costs; coordinating all financial reports and activities with P&J's outside accountants; interfacing directly with P&J's attorneys, vendors, business partners and clients; and participating in the overall decision-making relating to P&J's operations. Through working for P&J for as long as he has and from performing each of these duties, Mr. Desvallees has obtained intimate knowledge of P&J's operations and has received invaluable training to assist Mr. Weisman in maintaining and improving P&J's operations.

16.     Joe and Mr. Desvallees worked together closely for approximately a year, without incident, until Joe's death. During his tenure at P&J, Mr. Desvallees, unlike Danielle, has obtained an unique understanding of P&J's ongoing business, and has become integral to P&J's continued operation and success.

17.     However, without Mr. Weisman's consent or knowledge, and without any justifiable explanation or warning, on July 18, 2006, Danielle purported to terminate Mr. Desvallees' employment and instructed him -- without the requisite authorization of the Managers of P&J -- to leave P&J's premises.

18.     Danielle's actions were improper and risked harming immediately P&J's business operations due to Mr. Desvallees' integral role with the company. To arrest that dangerous

situation, Mr. Weisman informed Mr. Desvallees that the so-called termination was invalid and that he remained gainfully employed by P&J. Undeterred and again without Mr. Wesiman's consent or knowledge, Danielle then sent Mr. Desvallees an e-mail -- full of false and malicious accusations -- again purporting to fire him and instructing him to leave the premises.

19.     Danielle went a further step, ordering P&J's bookkeeper, Ms. Ilene Butler, not to issue any P&J checks without Danielle's express authority -- and specifically not to issue any weekly salary checks to Mr. Desvallees. Danielle had no such authority to control P&J's finances unilaterally.

20.     It is axiomatic that all employees of P&J who have been properly hired -- with the unanimous consent of P&J's two Managers -- shall remain as employees, collecting weekly paychecks, unless that employee is terminated with the unanimous consent of the two Managers. That has not happened here with respect to Mr. Desvallees.

21.     Danielle's actions have had a deleterious effect on P&J because they have created an extremely unproductive, hostile work environment and have made employees of P&J intimidated and wary of doing anything contrary to her demands for fear of being fired. That point is evident from the fact that Ms. Butler has followed Danielle's ill-conceived orders not to pay Mr. Desvallees.

22.     This type of behavior is unjustified, destructive to P&J's business and counter to basic principals of business. It also serves to estrange other P&J employees and prevent P&J's employees, including Mr. Desvallees, from performing even the most basic job responsibilities.

23.     Continuing her campaign of harassment, on or about August 1, 2006, Danielle commenced an arbitration against Mr. Weisman and Mr. Desvallees - - even though Mr. Desvallees is not a party to the Agreement and never agreed to be bound by any arbitration

clause. Danielle claims breach of contract, breach of fiduciary duty and seeks an injunction preventing Mr. Desvallees from returning to work for P&J and from being paid by P&J and enjoining Mr. Weisman from making any employment-related decisions.

## COUNT I
### (Breach of Contract)

24. Mr. Weisman hereby realleges and incorporates paragraphs 1 - 23 above.

25. The Agreement requires the Managers to make all decisions relating to P&J unanimously. Danielle has breached the Agreement by wrongfully (i) purporting to terminate Mr. Desvallees and (i) convincing P&J's bookkeeper not to pay Mr. Desvallees' weekly paycheck, without first obtaining the consent and assent of Mr. Weisman, and by nevertheless doing so over his objections.

26. Furthermore, Danielle has taken such actions prior to this dispute being resolved in the arbitration, which also constitutes a breach of the Agreement. An injunction preventing Danielle from continuing her illicit actions and to maintain the status quo, including having Mr. Desvallees return to work for P&J and be paid by P&J, pending a determination in the arbitration is critical so that the arbitration can proceed and not be nullified by Danielle's actions.

27. Danielle's wrongful acts described above have caused and continue to cause direct, proximate and irreparable harm to Plaintiff, P&J and the investors of P&J.

28. Danielle's acts are without justification, are being committed through improper means and have proximately caused injury, including immediate and irreparable harm - - for which there is no adequate remedy at law.

## COUNT II
### (Breach of Fiduciary Duty)

29. Mr. Weisman hereby realleges and incorporates paragraphs 1 - 28 above.

7

30.  As a co-Manager of P&J, Danielle owes a fiduciary duty to Mr. Weisman, to P&J and to P&J's investors.

31.  The conduct of Danielle, as herein alleged, constitutes a breach of her fiduciary obligations to Mr. Weisman, to P&J and to P&J's investors. An injunction preventing Danielle from continuing her illicit actions and to maintain the status quo, including having Mr. Desvallees return to work for P&J and be paid by P&J, pending a determination in the arbitration is critical so that the arbitration can proceed and not be nullified by Danielle's actions.

32.  Danielle's acts are without justification, are being committed through improper means and have proximately caused injury, including immediate and irreparable harm, for which there is no adequate remedy at law.

## COUNT III
### (Declaratory Judgment)

33.  Mr. Wiesman hereby realleges and incorporates paragraphs 1 - 32 above.

34.  According to paragraph 5(b) of the P&J Agreement, "[a]ll decisions of the Managers shall be unanimous, although following a decision by the Managers, any one Manager can effectuate such decision (by signing of documents, etc.)."

35.  Danielle has breached that provision by her efforts to (i) fire Mr. Desvallees and (ii) discontinue paying him his salary without first getting the assent of Mr. Weisman to do so and over his objections.

36.  Danielle has further breached paragraph 5(b) by taking such actions without first resolving this dispute in the arbitration she commenced relating to these very facts.

37.  Plaintiff seeks a declaration that paragraph 5(b) is enforceable and that Danielle had no authority to act unilaterally and before the arbitration is determined. An injunction preventing Danielle from continuing her illicit actions and to maintain the status quo, including

having Mr. Desvallees return to work for P&J and be paid by P&J, pending a determination in the arbitration is critical so that the arbitration can proceed and not be nullified by Danielle's actions.

38.  There is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

[a]  enter judgment in Plaintiff's favor and against Danielle on Count I of the Complaint;

[b]  enter judgment in Plaintiff's favor and against Danielle on Count II of the Complaint;

[c]  enter judgment in Plaintiff's favor and against Danielle on Count III of the Complaint;

[d]  enter preliminary injunctive relief in aid of arbitration and to maintain the status quo ante against Danielle; and

[e]  award Plaintiff such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Robert I. Bodian (RB 2627)
Mintz, Levin, Cohn, Ferris,
  Glovsky and Popeo, P.C.
666 Third Avenue
New York, NY 10017
(212) 935-3000

Dated: August 8, 2006

STATE OF NEW YORK      )
                       )
                       ) :ss:
                       )
COUNTY OF NEW YORK     )

PETER WEISMAN, being duly sworn, deposes and says:

That he is the plaintiff in the within action; that he has read the foregoing Complaint and he knows the contents thereof; that the same is true to his own knowledge, except as to matter therein stated to be alleged on information and belief, and that as to those matters he believes them to be true; and that his domicile is 1034 Glendalyn Circle, Spartanburg, South Carolina 29302.

_____
Peter Weisman

Sworn to before me this
7th day of August 2006

_____
Notary Public

RAYMOND P. CORONA
Notary Public, State of New York
No. 4955992
Qualified in New York County
Commission Expires Sept. 11, 20 09

10

NYC 367702v.1